[Civ. No. 12633. First Dist., Div. One. June 10, 1944.]

JOSEPH LEO HYMAN, as Administrator with the Will Annexed, etc., Plaintiff and Appellant, v. ELIZABETH K. TARPLEE et al., Respondents; MARY G. WOODWARD, as Guardian, etc., Intervener and Appellant.

Fred L. Berry and Joseph Leo Hyman for Appellants.

Fabius T. Finch and Paul F. Fratessa for Respondents.

PETERS, P. J.—Joseph G. DeForest, as executor of the will of George H. Woodward, brought this action against Elizabeth K. Tarplee and her daughter, Irene Woodward Troy, to recover $4,071.26 deposited in a bank account in the name of Elizabeth K. Tarplee as trustee for George H. Woodward, on the theory that the deposit belonged to the estate of decedent. DeForest has since died and Joseph Leo Hyman substituted as plaintiff. Mary G. Woodward, as guardian of the persons and estates of her two minor daughters, was permitted to intervene. Her legal position is identical with that of the plaintiff. On the theory that Woodward, prior to his death, made a completed gift to Mrs. Tarplee of the money in question, which was accepted by her, the trial court determined that Mrs. Tarplee owned the deposit. The plaintiff and intervener appeal. Their main contention is that there is no evidence to show a completed gift.

The evidence most favorable to respondents is as follows: The decedent, George H. Woodward, was married three times. Mrs. Tarplee was his first wife, and defendant, Mrs. Troy, is their daughter. Woodward and Mrs. Tarplee were married in 1899 and divorced in 1907. There is some evidence that during their marriage Mrs. Tarplee loaned her husband $1,000 of her own money to finance a bicycle shop, which sum was never repaid. There was no property settlement at the time of the divorce, nor any provision for alimony. After the divorce the parties remained on friendly terms, and Woodward paid his former wife for the support and education of their daughter. In 1920 the daughter left college and married. Woodward strongly disapproved of the marriage, and, as a result, became estranged from his daughter. Thereafter, for many years, he did not see her. He did remain on friendly terms with Mrs. Tarplee, and, for a period of about five years, ending about 1923, he had his mother board with her.

Woodward married a second time. This marriage lasted but a few years, terminating in a divorce. In that proceeding he paid his second wife $30,000 in cash, and gave her a life estate in some valuable property in San Francisco. In 1923 he married a third time, this time to the intervener Mary G. Woodward. Two children were born of this marriage.

After his divorce from respondent, Woodward's new busi-

ness, a machine shop, prospered. He purchased a home in Hillsborough in which he and his third wife and their two children lived. He deeded this house to his third wife, together with an adjoining piece of vacant land. By his will he left his business, appraised at $40,000, to his two children by his third wife, and also left them some insurance. During the period 1920-1937 Woodward remained estranged from his daughter by his first wife, and, from 1923 to 1937 he saw Mrs. Tarplee on but one or two occasions.

By 1937 Woodward's third marriage was on the verge of collapse. At that time he was suffering from a heart ailment, and was highly nervous and excitable. He left his Hillsborough home and took a room in San Francisco. Shortly thereafter he called upon Mrs. Tarplee and became reconciled with his daughter, the respondent Irene, and her daughter, his grandchild. Irene, who had divorced her husband, was living with her mother, and was working. As time went on Woodward became very friendly with this family. He called every morning and gave his daughter a ride to work, and called for her nearly every night and rode her home. Nearly every day he returned to the Tarplee house after taking his daughter to work and had breakfast with Mrs. Tarplee, and would then rest. Mrs. Tarplee would put up his lunch and he would then go to his shop. He was too nervous to remain there any length of time, and many times he returned to the Tarplee home in the afternoon for a rest, or he would take Mrs. Tarplee for a ride. Nearly every evening he had dinner at the Tarplee house. Both he and his daughter enjoyed fighting and wrestling matches, and several nights a week he escorted her to such exhibitions. On Sunday he frequently took his granddaughter to the ball game.

During this period he stated, on many occasions, that he wanted to do something for his first wife, their daughter and granddaughter. He told them that he had a single premium five-year endowment policy for $5,000 which he had purchased with funds that were not community property of himself and his third wife, and that he wanted Mrs. Tarplee and his daughter to have this money. He was very appreciative of the care and consideration given to him by Mrs. Tarplee and their daughter, and also wanted to repay Mrs. Tarplee for the original $1,000 she had loaned him. He expressed

the thought that if he left the $5,000 to them by will, that there would be considerable trouble. He expressed these feelings many times before the date of the questioned gift. In June of 1938, before the due date of the policy, he went to the insurance company, and had the policy reduced to $2,500, and cashed in the other $2,500. For this he received a check from the insurance company for $2,066.68. He brought this check to the Tarplee home, there endorsed it, and handed it to Mrs. Tarplee stating, according to her testimony: "I want you to have it, if I would leave it, there would be too much trouble. . . . Well, I have got this money and I want you to have it, that is all I can do for you," and he says, "you know," he says, "I owe you a thousand dollars, and," he says "I am going to give you a power of attorney on a thousand dollars that I have in the bank, and," he says, "if I need anything you take it out of that." After endorsing the check, he handed it to her and stated: "Here, this is yours." Mrs. Tarplee further testified that when he handed the check to her she stated: "George, you really hadn't ought to give me this, suppose you might need this yourself." He replied: "I won't need it, it is for you; that is all I can do for you and I want you to have it . . . you know, I owe you that thousand and I will try to make up for what I didn't give you and Irene." Mrs. Tarplee testified that she then suggested that the money be deposited in the bank in her name with Woodward as beneficiary; that she had such an account with her daughter and understood that if anything happened to her, the daughter would get that account; that if anything happened to her and her daughter she thought Woodward should get the money here involved.

On cross-examination she testified that she took the first check "with the understanding that it was for me . . ."; that when he handed her the check he stated: "That is for you. That is yours and I don't want any part of it. I will be taken care of, I have the shop. . . . This check is yours. Here, take it."

The respondent Mrs. Troy, corroborated the story told by her mother in all important particulars.

After the check had thus been handed to Mrs. Tarplee she put it in her purse and kept it for several days until she had an opportunity to go to the bank with Woodward. The check was deposited in a new account in the name of "Elizabeth

K. Tarplee, trustee for George H. Woodward.'' Mrs. Tarplee kept possession of the bank book.

A few days after the account was opened, Woodward cashed in the balance of the insurance policy and received a check for $2,004.58. Either he or Mrs. Tarplee deposited this check in the account. Mrs. Tarplee first testified that this check was also endorsed and handed to her and that she deposited it, but later she testified that Woodward may have deposited the second check. The evidence is clear, however, that Woodward intended this second check to be part of the same transaction with the first check. After the deposit of the second check the account had a balance of $4,071.26. Mrs. Tarplee withdrew $71.26, and apparently divided it with Woodward in order that the account should have a balance of an even $4,000. Mrs. Tarplee kept the bank book, and no further money was withdrawn from the account until after Woodward's death, which occurred several weeks later. After Woodward's death she withdrew the money and opened another trust account in her name as trustee for her daughter.

As was indicated above, about the time of these transactions Woodward also gave Mrs. Tarplee a power of attorney to draw on an account of his in which there was $1,000 on deposit. This was done, according to her testimony, in order that, if he became ill, she could secure money to pay his expenses. No money was withdrawn from this account prior to Woodward's death. After his death Mrs. Woodward attempted to withdraw this money to pay his funeral expenses, but the bank, having heard of Woodward's death, properly refused payment. This money, of course, belongs to the estate.

This is a fair summary of the evidence produced by the respondents. It seems too clear to require extended comment that such evidence supports the conclusion of the trial court that there was a completed gift of this money to Mrs. Tarplee.

The essentials of a valid gift are thus summarized in 13 Cal.Jur. p. 32, § 1: ''The essentials of a valid gift are (1) competency of the donor to contract, (2) a voluntary intent on the part of the donor to make a gift, (3) delivery either actual or symbolical, amounting to a transfer of title, (4) acceptance, actual or imputed, (5) a complete divestment of all control by donor, and (6), a lack of consideration in return for the gift.''

812

■ Appellants urge that the evidence fails to show a delivery by Woodward or an unequivocal acceptance by Mrs. Tarplee, and fails to show that the money was not in fact held in trust for Woodward. So far as delivery is concerned, appellants place their main reliance on the rule that a gift of the donor's own note or check is not enforceable by the donee against the donor or his estate, in the absence of an estoppel, for the reason that it only amounts to a promise to make a gift in the future, and is no more enforceable than any other promise to make a gift. That is undoubtedly the law. (*Coon* v. *Shry,* 209 Cal. 612 [289 P. 815] ; *Tracy* v. *Alvord,* 118 Cal. 654 [50 P. 757] ; *Wisler* v. *Tomb,* 169 Cal. 382 [146 P. 876] ; *Hironymous* v. *Hiatt,* 52 Cal.App. 727 [199 P. 850].) But that rule has no application to the facts of this case. That rule only applies where the alleged donor is the maker of the note or the check. It has no application at all to a case, such as the present one, where the alleged donor is the payee of the note or check. In such event, just as in the case of other choses in action given the requisite intent, title passes to the note or check upon physical delivery to the donee, even without endorsement. (*Edwards* v. *Wagner,* 121 Cal. 376 [53 P. 821] ; *Druke* v. *Heiken,* 61 Cal. 346 [44 Am.Rep. 553] ; *Eckstrom* v. *Brooks,* 115 Cal.App. 727 [2 P.2d 207] ; see cases collected 38 C.J.S. § 54, p. 840; 24 Am. Jur. § 83, p. 773.)

■ So far as acceptance is concerned, appellants urge that Mrs. Tarplee did not unequivocally accept the proffered gift, but insisted that Woodward retain some interest therein. It is far more reasonable to interpret the evidence as indicating that Mrs. Tarplee did unequivocally accept the gift, but wanted to assure Woodward that if anything happened to her and their daughter the money would be returned to him. She obviously was disturbed over the possibility that he might need hospital and medical care and might be unable to get ready cash to pay for them. That problem was taken care of by the $1,000 deposit.

■ So far as the form of the deposit is concerned, a trust in which Woodward had a present interest was not necessarily created thereby. Such deposits are frequently used where the so-called trustee retains the right to withdraw all of the money deposited, and the so-called beneficiary is entitled to the balance only upon the death of the depositor, if no other disposition has been made of the fund by the de-

positor. (*Estate of Alberts*, 38 Cal.App.2d 42 [100 P.2d 538].) Such trusts are "tentative trusts," revocable at will, and in the absence of agreement to the contrary, the beneficiary has no right to withdraw the money prior to the death of the trustee. (*In re Totten*, 179 N.Y. 112 [71 N.E. 748, 1 Ann.Cas. 900, 70 L.R.A. 711].) For a full description of such trusts see Restatement of Law of Trusts, volume 1, section 58, page 181. Such a form of deposit is not necessarily inconsistent with a completed gift to Mrs. Tarplee.

The only other point urged by appellants is that the trial court abused its discretion in permitting respondents to amend their answer upon motion prior to trial. When the original answer was filed respondents were represented by a lawyer who subsequently died. In this original answer the respondents alleged that the money was deposited for the use and benefit of Woodward during his lifetime and was to become the property of respondents only upon Woodward's death. After the death of the lawyer that had prepared this answer, the present lawyers were retained. They examined the pleadings and consulted with their clients and discovered that the original answer incorrectly set forth the facts. Several weeks prior to trial the new lawyers served and filed a notice of motion to amend the answer. That motion was supported by affidavits and by a draft of the proposed amended answer. The amendment consisted in alleging a completed absolute gift prior to the death of Woodward. The motion was opposed by appellants, and, after a hearing, permission to file the amended answer was granted by the court.

Appellants urge that in allowing this amendment the court abused its discretion in that the amended answer sets up an entirely different transaction than the one relied upon as a defense in the original answer. One case is cited, *Webster-Soule Farm* v. *Woodmansee's Adm'r*, 36 Idaho 520 [211 P. 1090], in which it was held that the court did not abuse its discretion in refusing to permit an amendment which directly contradicted an allegation of fact contained in the original pleading.

The granting or refusing of leave to amend an answer is within the sound discretion of the court. Such discretion will seldom be disturbed where exercised for the purpose of allowing the true facts to be alleged. The rule that the court should be liberal in allowing amendments when they do not seriously impair the rights of the opposite party is particu-

larly applicable to answers. (See cases collected 21 Cal.Jur. § 140, p. 203.) The allowance of this amendment was obviously within the discretion of the lower court.

The judgment appealed from is affirmed.

Knight, J., and Dooling, J., pro tem., concurred.